## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AARON KATZ LAW LLC,<br><br>        Plaintiff,<br><br>v.<br><br>ISSAC LAUFER,<br><br>        Defendant. | Case No. _____ |

## **COMPLAINT**

Plaintiff Aaron Katz Law LLC ("AKL") is a litigation boutique based in Boston.  AKL's founding partner Aaron Katz ("Katz") is a former partner of Ropes & Gray LLP.  Katz has nearly two decades of federal court experience and has defended some of the country's leading healthcare companies against healthcare fraud allegations, including at trial.  Katz launched AKL on October 3, 2022 with his former Ropes & Gray colleague Keira Zirngibl ("Zirngibl").

AKL brings this breach of contract complaint against its former client Issac Laufer ("Laufer").  Laufer owns at least ten skilled nursing facilities ("SNFs") located in the Westchester, New York and Long Island, New York areas.  Laufer is a named defendant in an intervened False Claims Act lawsuit pending in the Southern District of New York, captioned *United States ex rel. Integra Med Analytics LLC v. Laufer et al*, No. 7:17-cv-09424 (S.D.N.Y.) (the "Government Lawsuit").  The other named defendants in the Government Lawsuit are the SNFs that Laufer owns (the "Laufer SNFs") and a company that Laufer owns that provides various consulting services to Laufer's SNFs ("Laufer's consulting company").  The government alleges that Laufer, Laufer's SNFs, and Laufer's consulting company engaged in a scheme to fraudulently bill the Medicare

program for medically unnecessary and medically unreasonable care from at least January 2010 through September 2019.  Laufer has denied the government's allegations.

Katz was a partner at Ropes & Gray when he began serving as Laufer's lead counsel of record in the Government Lawsuit.  Katz was the only Ropes & Gray partner to work on the Government Lawsuit.  When Katz resigned from Ropes & Gray to launch AKL, Laufer disengaged Ropes & Gray and engaged AKL to represent him.  AKL thereafter represented Laufer in the Government Lawsuit from October 2022 through June 2023.

At the outset of AKL's representation of Laufer, Laufer agreed and manifested his assent to a set of clear and reasonable engagement terms, including the hourly rates that AKL would charge Laufer for Katz's and Zirngibl's working time.  AKL billed Laufer for its services consistent with the engagement terms to which Laufer agreed and manifested his assent.  AKL also charged Laufer, in a manner consistent with the engagement terms, for reasonable expenses AKL incurred in providing its services—namely, the expenses Katz incurred traveling between Boston and New York for court hearings and case-related meetings.

Laufer timely and fully paid the five monthly invoices that AKL issued for services provided and expenses incurred during the period October 2022 through February 2023.  Laufer, however, has completely failed to pay AKL for the services the firm provided and the expenses the firm incurred during the period of March 2023 through June 2023.  Those unpaid invoices total $104,527.58, nearly all of which constitutes fees.  Of that amount, $100,102.58 reflects services performed and expenses incurred during the period March 2023 through May 2023.

On June 22, 2023, Laufer decided to disengage AKL.  Laufer did so after deciding to retain his close personal friend Eric Herschmann ("Herschmann") and Herschmann's former law firm Kasowitz Benson Torres ("Kasowitz") to serve as his lead counsel of record in the Government

Lawsuit.  Since that time, AKL has made repeated inquiries to Laufer regarding the status of AKL's unpaid invoices.  Laufer has essentially ignored these inquiries, and it is clear from the circumstances that Laufer has no intention of paying AKL's outstanding invoices unless compelled to do so.

The AKL invoices that Laufer has failed and is refusing to pay reflect work that Katz and Zirngibl capably, efficiently, and reasonably performed on Laufer's behalf in the Government Lawsuit, as well as expenses that AKL reasonably incurred in providing its services to Laufer. Laufer never expressed any objection to any of AKL's invoices.  To the contrary, Laufer told Katz several times that AKL's invoices were fair and reasonable, including as recently as May 1, 2023. The amounts that AKL billed Laufer did not exceed any budgets or estimates that AKL provided to Laufer or that Laufer sought to impose on AKL.  Simply put, Laufer has no valid basis to refuse to pay AKL's outstanding invoices in full.

## I.     The Parties

1.      AKL is a Massachusetts limited liability company based in Massachusetts.  AKL does not have offices outside of Massachusetts, nor does it employ anyone outside Massachusetts.

2.      AKL's two members—Katz and Zirngibl—are full time Massachusetts residents.

3.      Laufer is a resident of New York State.

## II.    Jurisdiction and Venue

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000 and there is complete diversity of citizenship between the parties.

5.      This Court has specific personal jurisdiction over Laufer because (i) by retaining AKL, which Laufer knew to be a law firm based entirely in Massachusetts, Laufer purposefully

availed himself of Massachusetts; and (ii) the legal work that AKL performed but for which Laufer is refusing to pay was performed predominantly in Massachusetts.

6.      Venue in the District of Massachusetts is proper because a substantial part of the events giving rise to this action—namely, the majority of the legal work that AKL performed for Laufer but for which Laufer is refusing to pay—occurred in Massachusetts.

7.      The engagement terms to which Laufer agreed and manifested his assent includes a written mandatory arbitration provision.  AKL, however, is electing not to enforce this arbitration provision.  AKL understands that Laufer likewise does not wish to enforce the arbitration provision.  The arbitration provision therefore does not preclude this Court from hearing the instant dispute.

### III.    Choice of Law

8.      AKL asserts that Massachusetts substantive law applies to its causes of action.  In any event, whether Massachusetts or New York substantive law applies is inconsequential to AKL's right to recovery on its causes of action.

### IV.    Facts

#### A.  Laufer's Business Background

9.      Laufer is an entrepreneur who owns, directly or indirectly, multiple businesses.  He also owns multiple pieces of commercial real estate and residential real estate in New York.

10.     Laufer owns at least ten SNFs in the Westchester, New York and Long Island, New York areas ("Laufer's SNFs").  Laufer's SNFs provide services to Medicare beneficiaries.

11.     Laufer also owns a company that provides various consulting services to Laufer's SNFs ("Laufer's consulting company").

4

**B. Laufer Selects Katz to Serve as His Legal Counsel**

12.    In February 2021, Laufer selected Katz to be his personal legal counsel.  At the time, Katz was a partner at Ropes & Gray, and the United States Attorney's Office for the Southern District of New York was investigating Laufer, Laufer's SNFs, and Laufer's consulting company for Medicare fraud, pursuant to its False Claims Act investigative authority.

13.    In late May 2021, Assistant United States Attorney Jacob Bergman informed Katz that (i) Laufer was a named defendant in an under seal *qui tam* complaint, and (ii) the government was electing to intervene in the *qui tam* and would be filing an intervenor complaint naming Laufer, Laufer's SNFs, and Laufer's consulting company as defendants.

14.    The *qui tam* complaint was unsealed on June 2, 2021.  The *qui tam* complaint alleged that Laufer's SNFs "received approximately $450 million in Medicare reimbursement . . . between 2011 and 2016."  The *qui tam* further alleged that, between 2011 and 2016, Laufer's SNFs, "[t]hrough their fraudulent practices . . . , submitted more than $129.15 million in false claims for Medicare reimbursement . . . ."

15.    Also on June 2, 2021, the government filed its intervenor complaint.  The intervenor complaint alleges, *inter alia*, that Laufer "pressured" personnel at his SNFs to fraudulently bill Medicare for medically unreasonable and medically unnecessary care from at least January 2010 through September 2019.

16.    The government is seeking to hold Laufer jointly and severally liable for the entire amount of Medicare reimbursement that, according to the government, Laufer's SNFs fraudulently received during the relevant time period.

17.    In court submissions authored, signed, and filed by Katz, Laufer denied the allegations and causes of action against him.

18.     Shortly after the government filed its intervenor complaint, Katz entered an appearance as Laufer's lead counsel in the Government Lawsuit.  No lawyer other than Katz entered an appearance as Laufer's counsel at that time.  Lawyers at other big law firms variously entered appearances for Laufer's SNFs and Laufer's consulting company (collectively, the "corporate co-defendants").

19.     Katz was the only Ropes & Gray lawyer ever to enter an appearance for Laufer in the Government Lawsuit, the only Ropes & Gray partner ever to perform work on the Government Lawsuit, and the only Ropes & Gray lawyer with whom Laufer ever spoke or met.

20.     Laufer paid in full, on a relatively timely basis and without objection, all of the invoices that Ropes & Gray issued to him.

**C.  Laufer Retains AKL in October 2022**

21.     On September 1, 2022, Katz informed Laufer via phone call that Katz would be resigning from Ropes & Gray on September 30, 2022 and launching AKL immediately thereafter. On that phone call, Laufer congratulated Katz for the move and stated that he definitely would transition his representation in the Government Lawsuit from Ropes & Gray to AKL.

22.     On September 6, 2022, Laufer asked Katz whether he had "a new email" address. Katz replied, "My ropes email will work through 9/30. . . . My new firm's email address will only be activated once I launch the website . . . ."  Laufer replied, "Thank u.  Wishing you lots of good fortune in your new endeavor."  Katz replied, "I appreciate it!  It's been something I have wanted to do for a while, and clients like you make it possible!"

23.     On September 8, 2022, Katz informed Laufer via text message that Zirngibl would be joining Katz at AKL.  Laufer replied, "Wow!  I'm so happy for u bro!!!"

24.     On September 30, 2022, Katz resigned from Ropes & Gray as planned.  On October 3, 2022, Katz and Zirngibl officially launched AKL.

25.     Laufer retained AKL—and disengaged Ropes & Gray—so that Katz could continue to serve as Laufer's lead counsel of record in the Government Lawsuit.  Laufer understood that AKL would bill him for the time Katz and Zirngibl spent working on the Government Lawsuit, as well as for the expenses that AKL reasonably incurred in providing its legal services.  Laufer also understood that he would incur significant legal fees and expenses defending himself in the Government Lawsuit.

26.     On October 6, 2022, Katz and Laufer met in person to discuss, *inter alia*, AKL's engagement terms.  During that meeting, Katz told Laufer the standard hourly rates that AKL would charge clients for Katz's and Zirngibl's time.  Laufer understood that these rates were substantially less than the hourly rates that Laufer had been paying to Ropes & Gray.  Specifically, Katz's standard hourly rate at AKL was approximately 35% lower than his standard hourly rate at Ropes & Gray, and Zirngibl's standard hourly rate at AKL was approximately 40% lower than the standard hourly rate of a comparably experienced Ropes & Gray associate.  Katz also told Laufer that AKL would discount his and Zirngibl's standard hourly rates by $100, in light of the fact that the Government Lawsuit would likely entail a significant volume of work.  Laufer readily agreed that the hourly rates that Katz proposed were fair and reasonable and that Laufer would pay these rates.[1]

27.     At the October 6, 2022 meeting, Katz told Laufer that, based on Laufer's history of fully paying Ropes & Gray's invoices and the good personal relationship between Katz and Laufer,

---

[1] In the October 6, 2022 meeting, Katz provided Laufer the specific dollar amounts that AKL would charge Laufer for each hour of Katz's working time and Zirngibl's working time.

AKL trusted that Laufer would pay AKL's invoices in a timely manner.  Laufer assured Katz that he would always do so.  Based on Laufer's assurances, AKL agreed not to require a retainer.

28.     Katz told Laufer at the October 6, 2022 meeting that he would send Laufer the following day a written engagement letter memorializing the material engagement terms that he and Laufer had discussed and to which Laufer had agreed.

29.     On October 7, 2022, Katz sent Laufer the AKL engagement letter via email.  The engagement letter clearly and conspicuously spelled out, *inter alia*, (i) Katz's and Zirngibl's hourly rates,[2] (ii) Laufer's responsibility to reimburse AKL for certain enumerated expenses that AKL incurred in providing legal services to Laufer, and (iii) that Laufer was personally liable for AKL's invoices.  These material terms were fully consistent with the material terms that Katz and Laufer had discussed, and to which Laufer had agreed, at the October 6, 2022 meeting.

30.     In his cover email attaching the October 7, 2022 engagement letter, Katz asked Laufer to "let [Katz] know" if Laufer had "any questions or concerns about any of the [letter's] provisions . . . ."  Laufer never raised any questions or concerns regarding the engagement letter's terms.

**D.  AKL Bills Laufer for Legal Services It Provides in the Government Lawsuit**

31.     From October 2022 through mid-June 2023, AKL provided legal services to Laufer in the Government Lawsuit.  AKL provided these legal services at Laufer's request, with Laufer's knowledge, and pursuant to and consistent with the engagement terms to which Laufer had agreed and manifested his assent.

---

[2] The October 7, 2022 engagement letter set forth the specific dollar amounts that AKL would charge Laufer for each hour of Katz's working time and Zirngibl's working time.  These dollar amounts were identical to the dollar amounts Katz provided to Laufer, and to which Laufer agreed, at the October 6, 2022 meeting.

32.     AKL billed Laufer for its services in a manner that was fully consistent with the engagement terms to which Laufer had agreed and manifested his assent.

33.     AKL billed Laufer for its services on a monthly basis.  Pursuant to Laufer's request, Katz issued AKL's monthly invoices to Laufer by sending the invoices via email to Jay Itzkowitz ("Itzkowitz"), the chief financial officer of Laufer's consulting company.  In all instances, Katz issued the invoices within a week of month's end, and usually with a few days of month's end (*e.g.*, the October 2022 invoice was issued on November 2, 2022, etc.).

34.     The work for which AKL billed Laufer was performed efficiently, was high quality, and was charged at hourly rates that were objectively reasonable and known to and agreed upon by Laufer in advance.

35.     AKL ensured that the legal services for which it billed Laufer were not unnecessarily duplicative of the legal work that lawyers representing the corporate co-defendants were performing.  AKL also shared its work product freely with counsel for the corporate co-defendants, so as to ensure that counsel for the corporate co-defendants would not need to perform work unnecessarily duplicative of the work AKL was performing.

36.     AKL also took other steps to ensure that Laufer was not billed for unnecessary legal services or unnecessary or unreasonable expenses.  For example:

> (i)     Katz was the only AKL lawyer to attend status conferences and motion hearings.

> (ii)    When Katz was required to be in New York for court appearances or case-related meetings, Katz often elected to travel from Boston to New York via his own personal car, rather than by airplane or train.  Katz did this in order to reduce the travel expenses for which Laufer otherwise would have been

responsible.  Because of the distances between La Guardia and JFK airports, on the one hand, and the SDNY's White Plains courthouse and Laufer's businesses on the other, Katz's willingness to drive to and from New York in his own car saved Laufer thousands of dollars in travel expenses.

(iii)   Katz stayed at budget hotels during his trips to New York, or avoided hotels altogether by completing his round-trip travel in a single day.

(iv)   AKL did not bill Laufer for Katz's or Zirngibl's non-working travel time to and from New York—travel time that collectively totaled at least 50 hours.

(v)   AKL did not bill Laufer for the firm's legal research software costs, which is a cost that many BigLaw firms pass through to their clients.

(vi)   AKL unilaterally and proactively (*i.e.*, without being requested to do by Laufer) "wrote off" billable time that Katz and Zirngibl spent working on the Government Lawsuit, meaning that such time never appeared at all on the invoices that AKL issued to Laufer.  AKL believes that it unilaterally and proactively "wrote off" dozens of hours of attorney time that it was fully entitled to bill.

37.   Laufer paid in full, without objection, and in a relatively timely fashion the five monthly invoices that AKL issued for services provided during the period of October 2022 through February 2023.  Those five monthly invoices totaled approximately $67,000 and ranged from ~$7,000 to ~$22,000.  Laufer paid the February 2023 invoice in mid-April 2023.  This is the last payment that AKL has received from Laufer.

38.   The period of March 2023 through June 2023 was an especially busy one, during which the defendants' counsel (including Katz and Zirngibl on behalf of Laufer) were, *inter alia*,

(i) working to respond to various document requests and interrogatories that the government propounded in late December 2022, (ii) engaged in various discovery-related motion practice, and (iii) conducting other work related to discovery. Laufer was fully aware of the work AKL was performing.

39. AKL's monthly invoices for the period March 2023 through June 2023 totaled $104,527.58. Broken down by month, the invoices totaled $36,010.58 (March 2023), $33,075 (April 2023), $30,487.50 (May 2023), and $4,425.00 (June 2023). With respect to the June 2023 invoice, Katz elected to bill Laufer only for time worked through June 5th.

40. All of the work that AKL performed and billed with respect to the March 2023 through June 2023 period was work that reasonably needed to be performed, and Laufer never expressed any objection to AKL performing that work.

41. AKL's monthly invoices for services performed during the period March 2023 through June 2023 were issued to Laufer on April 2, May 1, June 2, and June 22, respectively. By expeditiously issuing its monthly invoices to Laufer, AKL enabled Laufer to keep track of and raise any concerns he might have regarding AKL's monthly legal spend and the trajectory of that spend.

42. Laufer never expressed any objections to or concerns regarding AKL's legal spend or the trajectory of that spend.

43. AKL's legal spend during all months, including the March 2023 through June 2023 period, was objectively reasonable and significantly below what Katz, in early October 2022, told Laufer he should anticipate. AKL never exceeded any budgets or estimates that it provided to Laufer or that Laufer sought to impose on AKL.

11

44.     On several occasions, Laufer made comments to Katz about how Katz's resignation from Ropes & Gray had been financially advantageous to Laufer, in that Katz's and Zirngibl's hourly rates at AKL were so much lower the hourly rates Laufer had been paying to Ropes & Gray.

**E.  Laufer Makes a Decision to Stop Paying AKL's Invoices**

45.     In late March 2023, Laufer informed Katz that he was considering hiring the law firm of Kasowitz Benson Torres ("Kasowitz") and former Kasowitz partner Eric Herschmann ("Herschmann") to join the defendants' joint defense team in the Government Lawsuit in some capacity.  Katz understood that Herschmann was a close personal friend of Laufer's and that Herschmann, though no longer a Kasowitz partner, maintained an affiliation with Kasowitz.

46.     Laufer represented to Katz that he wanted AKL and the Kasowitz/Herschmann team to work together.  Katz told Laufer that he would be fine with such an arrangement.

47.     Between late March 2023 and April 2023, Katz and Zirngibl, at Laufer's request, performed work to help the Kasowitz lawyers and Herschmann get "up to speed" on the Government Lawsuit.  Laufer understood that AKL would bill Laufer for this work.

48.     On May 15, 2023—three days prior to the date on which Laufer's payment on AKL's March 2023 invoice was due—Herschmann informed Katz during a phone call that (i) Herschmann and certain Kasowitz lawyers would be entering appearances as Laufer's counsel of record in the Government Lawsuit, (ii) Laufer would be asking certain of the corporate co-defendants' lawyers to withdraw their appearances in the Government Lawsuit (including Goodwin Procter partner and former Assistant United States Attorney Miranda Hooker), and (iii) the legal representation of Laufer's SNFs would be consolidated to a single law firm, Bradley Arant Boult Cummings.

49.     During that May 15, 2023 phone call, Herschmann did not tell Katz that Katz should or would be asked to withdraw his appearance in the Government Lawsuit.  To the contrary, Herschmann advised Katz that Laufer wanted AKL to work with the Kasowitz/Herschmann team and for Katz to remain one of Laufer's counsel of record in the Government Lawsuit.  Soon after the May 15, 2023 phone call between Herschmann and Katz, Laufer confirmed to Katz that this was Laufer's desire.

50.     On May 25, 2023, Herschmann and certain Kasowitz lawyers entered notices of appearances as Laufer's counsel of record in the Government Lawsuit.  This was the first time that any lawyer other than Katz had filed a notice of appearance as Laufer's counsel of record in the Government Lawsuit.

51.     During May and June 2023, AKL continued to share its existing work product and its case-related knowledge with the Kasowitz/Herschmann team, just as it had during late March and April 2023.

52.     During May and June 2023, AKL also performed additional work at the specific request and direction of the Kasowitz/Herschmann team.  The Kasowitz/Herschmann team utilized AKL's work product.

53.     AKL reasonably expected to be paid for the work Katz and Zirngibl performed at the request of the Kasowitz/Herschmann team.  Laufer understood that AKL would bill him for such work, and Laufer did not indicate that he would refuse to pay for this work.

54.     At no point during the period of March 2023 through June 21, 2023 did Laufer, directly or indirectly, expressly or implicitly, instruct Katz or Zirngibl that they should cease performing work on the Government Lawsuit or advise Katz or Zirngibl that Laufer did not intend to pay AKL for the work that it was continuing to perform for Laufer's benefit.

55.     On June 22, 2023, Laufer requested that Katz withdraw his appearance in the Government Lawsuit.  Laufer further informed Katz that "if [Kasowitz or Herschmann] need[s] you they'll call you, thank you[.]"

56.     With Laufer's consent, Katz filed a withdrawal motion on June 22, 2023.  That same day, Katz issued Laufer a "final invoice" for work performed during June 2023.  Katz elected to include on that final invoice only time spent during the first five days of June 2023, notwithstanding that Katz and Zirngibl had performed billable work during the period between June 6 and June 21, 2023.

57.     The district court granted Katz's withdrawal motion on June 23, 2023.

58.     On June 23, 2023, Katz sent Laufer a disengagement letter that made clear that Laufer remained liable to pay AKL's outstanding invoices, which by that time totaled $104,527.58. The disengagement letter also stated that AKL would remain available to assist the Kasowitz/Herschmann team as necessary, per Laufer's request.  Laufer never responded to the disengagement letter.

### F.  Laufer Repeatedly Ignores or Attempts to Deflect AKL's Requests for Payment

59.     AKL's March 2023 invoice became past-due in mid-May 2023, and its April 2023 invoice became past-due in mid-June 2023.

60.     From mid-June 2023 through July 2023, Katz sent several written inquiries to Laufer, Itzkowitz, and another of Laufer's business personnel named Fran Ross regarding the status of the unpaid and past-due AKL invoices.

61.     Rather than arrange for payment of AKL's outstanding invoices, Itzkowitz and Ross told Katz that AKL's outstanding invoices were "under review" by an unidentified

"attorney."  On information and belief, Ross and Itzkowitz were acting at the direction of Laufer when they made these representations.

62.     On July 24, 2023, AKL issued Laufer a letter demanding that payment on the significantly past-due March 2023, April 2023, and May 2023 invoices be made by July 31, 2023. AKL's letter concluded: "If we do not receive a written response from you or [Itzkowitz] by the close of business on July 26th, we will consider such lack of response to be a representation that you do not intend to pay the invoices and that you will not be invoking the engagement letter's mandatory arbitration provision."  AKL copied Itzkowitz on the letter.

63.     Laufer and Itzkowitz failed to respond to the July 24, 2023 letter, either in writing or orally, either personally or via a representative.

64.     On August 1, 2023, Itzkowitz emailed Katz regarding the unpaid AKL invoices. The email stated in full: "Hi, Aaron.  Your invoices were reviewed along with the engagement letter and the question arose as to why your law firm is billing us in quarter-hour increments as opposed to the usual tenth of an hour that the other attorneys are billing us.  There is no reference to quarter hour increments in the engagement letter.  Please advise."  This was the first time that Laufer or any of Laufer's representatives ever questioned Katz about a Ropes & Gray or AKL invoice.

65.     Katz responded to Itzkowitz's August 1, 2023 email by directing Itzkowitz's attention to the conspicuously placed sentence on page 2 of the October 7, 2022 engagement letter, under the heading "Fees for Services Rendered," that reads: "We will bill for our time in quarter-hour increments[.]"

66.     In addition to making a false representation about the content of AKL's engagement letter, Itzkowitz knew that certain of "the other attorneys" had been billing the corporate co-defendants other than by the tenth of an hour.

67.     Ropes & Gray also had invoiced Laufer in quarter-hour increments, and Laufer never told Katz that he objected to Ropes & Gray billing him in such increments.

68.     Despite repeated requests, AKL still has not received any representations or assurances from Laufer or any of Laufer's business personnel (including Itzkowitz or Ross) that Laufer intends to pay AKL's outstanding invoices.

69.     Katz recently learned that Laufer and/or Laufer's companies have a history of refusing to pay without justification reasonable invoices issued by law firms that Laufer or Laufer's companies have retained as their counsel.  Laufer never disclosed this fact to Katz.

70.     AKL has reasonably concluded that Laufer does not intend to pay AKL's outstanding invoices.

71.     Laufer has no legitimate basis for his failure and refusal to pay AKL's outstanding invoices.  On information and belief, Laufer knows this but has cynically decided that, because AKL is no longer involved in the Government Lawsuit, Laufer has no personal interest in paying AKL's outstanding invoices.

## COUNT ONE (BREACH OF CONTRACT)

72.      AKL hereby realleges and incorporates the allegations in paragraphs 1-71 above.

73.     There was a valid and enforceable agreement between AKL and Laufer.

74.     The material terms of that valid and enforceable agreement between AKL and Laufer were agreed upon by Katz and Laufer at the October 6, 2022 meeting, and then set forth and memorialized in writing in the engagement letter that Katz sent to Laufer on October 7, 2022.

16

75.     Laufer agreed and manifested his assent to the engagement terms set forth and memorialized in the October 7, 2022 engagement letter.

76.     At a minimum, Laufer agreed and manifested his assent to (i) AKL's hourly billing rates for Katz and Zirngibl, (ii) AKL's billing in quarter-hour increments, (iii) AKL's requiring Laufer to reimburse AKL for Katz's travel expenses for court hearings and case-related meetings, and (iv) AKL's holding Laufer personally responsible for AKL's invoices.

77.     Laufer agreed and manifested his assent to the material terms of the AKL engagement through (i) his words and conduct in the October 6, 2022 meeting, (ii) his decision not to raise with AKL any objection to any aspect of the October 7, 2022 engagement letter, (iii) his timely payment in full of AKL's monthly invoices for the months of October 2022 through February 2023, (iv) his lack of any objection to AKL's March 2023 through June 2023 invoices, and (v) the statements he made to Katz during the October 2022 through May 2023 period regarding AKL's work and its invoices.

78.     Pursuant to the valid and enforceable agreement between Laufer and AKL, Laufer is obligated to pay AKL for (i) the legal services that AKL reasonably provided to Laufer with respect to the Government Lawsuit, at the hourly rates to which Laufer agreed; and (ii) the travel-related expenses that AKL reasonably incurred in providing those services.

79.     The amounts that AKL billed to Laufer for work performed during the period March 2023 through June 2023 reflect work that AKL reasonably and capably performed with respect to the Government Lawsuit, as well as expenses that AKL reasonably incurred in providing those services.

17

80.     The outstanding March 2023 through June 2023 invoices that Laufer has failed to pay and is refusing to pay are entirely consistent with the terms of the valid and enforceable agreement that exists between Laufer and AKL.

81.     The amounts that AKL billed to Laufer for work performed during the period March 2023 through June 2023 are not contrary to any budget or estimates that AKL provided to Laufer or that Laufer sought to impose on AKL.

82.     Laufer's refusal to pay the outstanding AKL invoices constitutes breach of contract.

### COUNT TWO (*QUANTUM MERUIT*)

83.     AKL hereby realleges and incorporates the allegations in paragraphs 1-71 above.

84.     To the extent there was not a valid and enforceable contract between AKL and Laufer, Laufer nevertheless would be obligated to pay AKL's outstanding invoices pursuant to the doctrine of *quantum meruit*.

85.     The legal services that AKL provided to Laufer between March 1, 2023 and June 22, 2023, and for which AKL invoiced Laufer, provided a measurable benefit to Laufer.

86.     AKL reasonably expected compensation for the services it provided to Laufer between March 1, 2023 and June 22, 2023, as well as reimbursement for the expenses AKL reasonably incurred in providing those services.

87.     Laufer accepted AKL's legal services with actual knowledge that AKL reasonably expected to be paid for those services, as well as for the expenses it reasonably incurred.

88.     The benefit that Laufer received from the work for which he has not paid is at least equal to the amount of AKL's outstanding invoices (*i.e.*, $104,527.58).

89.     It would be unjust and inequitable to allow Laufer to avoid paying AKL for the legal services that AKL provided and the expenses AKL incurred in providing those services.

## COUNT THREE (PROMISSORY ESTOPPEL)

90.     AKL hereby realleges and incorporates the allegations in paragraphs 1-71 above.

91.     Laufer, through his words and conduct, promised AKL that he would pay AKL for the legal services AKL provided to him with respect to the Government Lawsuit, as well as for the expenses that AKL reasonably incurred in providing those services.

92.     AKL relied on Laufer's promises to its detriment, including by expending time providing legal services to Laufer that the firm's lawyers could have spent on other clients and other matters and by incurring expenses related to the Government Lawsuit that it reasonably expected Laufer to reimburse.

93.     It would be unjust and inequitable to allow Laufer to avoid paying AKL for the legal services that AKL provided and the expenses AKL incurred in the provision of those services.

## PRAYER FOR RELIEF

94.     AKL hereby realleges and incorporates the allegations in paragraphs 1-93 above.

95.     AKL hereby prays for the following relief:

   a.   An order declaring Laufer liable to AKL for the entire amount of AKL's outstanding invoices, to wit $104,527.58, plus pre- and post-judgment statutory interest;

   b.   An order declaring Laufer liable for the reasonably foreseeable consequential damages that AKL suffered as a result of Laufer's breach of contract;

   c.   An order declaring that Laufer's failure to pay AKL's outstanding invoices was in subjective bad faith;

   d.   An order requiring Laufer to pay AKL's costs incurred in this action;

e.  An order requiring Laufer to pay the attorneys' fees AKL incurred in this action, including the imputed cost of Katz's and Zirngibl's time representing AKL in this action; and

f.  All other relief that the Court deems just and appropriate.


Respectfully submitted,


/s/ *Aaron M. Katz*
Aaron M. Katz
Keira G. Zirngibl
AARON KATZ LAW LLC
399 Boylston Street, 6th Floor
Boston, MA 02116
(617) 915-6305
akatz@aaronkatzlaw.com

*Counsel to Plaintiff Aaron Katz Law LLC*

DATED: August 7, 2023