UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AARON KATZ LAW LLC,<br><br>    Plaintiff,<br><br>v.<br><br>ISSAC LAUFER,<br><br>    Defendant. | Case No. 23-CV-11801-PBS<br><br>ORAL ARGUMENT REQUESTED |

**OPPOSITION TO PLAINTIFF'S MOTION TO SET ASIDE THE DEFAULT ENTRY**

Defendant Issac Laufer's ("Laufer") eleventh-hour Rule 55(c) motion should be denied, and the Court should enter a default judgment in favor of plaintiff Aaron Katz Law LLC ("AKL"). Laufer's Rule 55(c) motion is supported only by a paper-thin, self-serving sworn declaration that provides no legitimate excuse for Laufer's flagrant disregard of the Court's procedural deadlines and no adequate basis to set aside the default entry, and his memorandum of law relies on inapposite cases that do not remotely support his position.

Between March 1 and June 23, 2023, AKL performed on Laufer's behalf—with Laufer's knowledge and at his direction—significant and substantial legal work in an intervened False Claims Act lawsuit in which Laufer is a named defendant. AKL's founding partner Aaron Katz ("Katz") served as Laufer's lead—and, until May 25, 2023, only—counsel of record in the lawsuit. AKL timely provided Laufer monthly invoices for its work, and those invoices provided line-item time entries describing the work that AKL had performed during the month and how long it took AKL's attorneys to perform it. The four invoices that AKL issued Laufer for the months of March through June 2023 totaled $104,527.58, of which Laufer has paid exactly $0.

AKL filed this lawsuit only after Laufer repeatedly ignored AKL's requests for payment and AKL's queries regarding whether Laufer wished to arbitrate the matter. Laufer learned of AKL's lawsuit the day after it was filed, but neither Laufer nor any of his representations contacted AKL regarding the lawsuit. Laufer then completely failed to respond to AKL's request for waiver of service. After the time set forth in Federal Rule of Civil Procedure 4(d)(1)(F) expired, AKL served the summons and complaint on Laufer in compliance with Federal Rule of Civil Procedure 4(e)(1) and Massachusetts Rule of Civil Procedure 4(e)(3). *See* ECF No. 4. According to his own sworn declaration, Laufer was aware that the summons and complaint had been delivered to his custom-built estate at 34 Astor Place, Monsey, New York via Federal Express direct signature required. Laufer then made a willful decision to take a "Rip Van Wickle strategy to this litigation," ignoring the clear deadline for filing an answer to AKL's complaint and then suddenly awakening fourteen days after the Court's entry of default. *Mach v. Florida Casino Cruise, Inc.*, 187 F.R.D. 15, 18 (D. Mass. 1999) (Saris, J.) (denying on similar facts the defendant's Rule 55(c) motion and entering a default judgment). Laufer has no meritorious defenses to AKL's complaint, and the pre-judgment interest of 12% per annum that is accruing by statute will in any event soon exceed (if it has not already) whatever frivolous, marginal quibbles Laufer might choose to invent with respect to AKL's unpaid invoices. Setting aside the default entry would prejudice AKL and unfairly enable Laufer to further delay paying AKL the amounts that Laufer owes.

## I. INTRODUCTION

Laufer is a sophisticated, successful entrepreneur with significant litigation experience. Unfortunately, Laufer also has a history of unjustifiably failing to pay debts that he owes, including the invoices of law firms retained to represent him and his businesses.

The genesis of this lawsuit is important to the Court's assessment of Laufer's Rule 55(c) motion. AKL filed this lawsuit only after Laufer (i) completely failed to pay four months of AKL invoices totaling $104,528.58, which represented roughly 2/3rds the amount that AKL billed Laufer for services rendered between October 2022 and June 2023; (ii) completely failed to provide any explanation (let alone plausible justification) for his total failure to pay the invoices; (iii) completely failed to provide AKL any assurance that any payment was forthcoming; (iv) completely failed to respond to AKL's gratuitous offer to write down the outstanding invoices by several thousand dollars in exchange for payment without further delay;[1] and (v) completely failed to respond to AKL's query regarding whether he wished to arbitrate the matter pursuant to the engagement letter's arbitration provision (a provision that grants AKL a veto-proof right to select the arbitrator and imposes 100% cost-shifting where the losing party is found to have proceeded in bad faith). *See* Exh. A (sworn declaration of Aaron M. Katz).

Laufer plainly learned of AKL's lawsuit no later than August 8, 2023, the day after the lawsuit was filed. On August 8, 2023, a Laufer spokesperson at the New York law firm Kasowitz Benson & Torres—whose lawyers entered appearances for Laufer in the False Claims Act lawsuit on May 25, 2023—made on-the-record comments to a Law360 reporter who contacted Kasowitz regarding AKL's lawsuit. *See* Exh. B (Law360 article reporting on AKL's lawsuit). Notwithstanding the spokesperson's public comments, neither Laufer nor any of his representatives (from Kasowitz or otherwise) ever contacted AKL regarding the lawsuit until November 10, 2023, fourteen days after the Court's entry of default. *See* Exh. A.

---

[1] As described in the complaint, AKL had already discounted its hourly rates and, on top of that, proactively had written off significant amounts of time for which it could have billed Laufer in the first instance.

3

The Court's entry of default on October 27, 2023 was the culmination of Laufer's willful disregard of AKL's lawsuit and the deadline for answering the complaint—a deadline that was posted clear as day on the public electronic docket. *See* ECF No. 4 (minute entry stating "answer due 10/18/2023"). On or about August 17, 2023, AKL mailed Laufer a written request for waiver of service; Laufer completely failed to respond that request. On September 27, 2023, after the time provided by Federal Rule of Civil Procedure 4(d)(1)(F) had expired, AKL served copies of the summons and complaint, via Federal Express direct signature required[2] to two of Laufer's residences, each of which clearly suffices for purposes of service of process—namely, Laufer's three-bedroom apartment in the exclusive "White House" building at 262 Central Park West in Manhattan and his custom-built estate in the village of Wesley Hills in Monsey, New York. *See* ECF No. 4, 4-1, and 4-2; *see also* Exh. C (Federal Express delivery receipt for the mailing made to the Manhattan apartment). Laufer previously told undersigned counsel that he "typically" is at the Manhattan apartment "mid week." *See* Exh. D (text communications between undersigned counsel and Laufer regarding the Manhattan apartment). In addition, Laufer previously hosted undersigned counsel as an overnight guest at the Monsey estate, which Laufer has expressly referred to as "[his] house" and which bears all the indicia of a permanent residence. *See* Exh. A (sworn declaration of Aaron M. Katz). Although Laufer also has a getaway place in Newburgh, New York, both the Manhattan apartment and the Monsey estate constitute "usual places of abode"

---

[2] "Direct signature required" means that Federal Express will not deliver the package unless someone at the recipient's address signs for it. If nobody is at the address to sign for the package, Federal Express will re-attempt delivery at another time.

at which Laufer can be properly served by signature-required mail pursuant to the applicable procedural rules.³ *See infra* at 6-9.

In his self-serving sworn declaration, Laufer does not deny that the delivery of the summons and complaint to his Monsey estate fulfilled the cardinal purpose of Federal Rule of Civil Procedure 4(e)(1) and Massachusetts Rule of Civil Procedure 4(e)—namely, providing actual notice of the complaint and the deadline for responding to it.⁴ To the contrary, Laufer *admits* that he was "aware of the Federal Express delivery to 34 Astor Place, Monsey, New York 10952" and that he "consulted with counsel" at that time. ECF No. 11-3, ¶ 8. The clear implication of Laufer's declaration is that, after consulting with counsel, he made a willful decision that he would neither answer the complaint by the October 18, 2023 deadline, nor timely request an extension of that deadline, nor contact AKL or undersigned counsel regarding the lawsuit. Instead, Laufer willfully chose to take a "Rip Van Winkle strategy to this litigation," *Mach*, 187 F.R.D. at 18 (Saris, J.), waiting until 94 days after learning of the lawsuit, 45 days after service of the summons and complaint, and 14 days after the default entry before making *any contact* with AKL with respect to the lawsuit.

Now, after completely and unjustifiably avoiding payment of AKL's outstanding invoices for months and months and months, Laufer seeks to avoid the consequences of his flagrant disregard of the October 18, 2023 deadline for answering AKL's complaint. As his main argument, Laufer asserts that the September 27, 2023 deliveries of the summons and complaint to his Manhattan apartment and his Monsey estate were ineffective because the summons and

---

³ According to the Federal Express delivery receipt, the delivery of the summons to the Monsey estate was signed for by "L. Issac." *See* ECF No. 4-2.

⁴ Laufer's declaration omits any mention of the simultaneous delivery of the summons and complaint to his Manhattan apartment.

5

complaint were not also delivered to a house in Newburgh, New York that Laufer owns. Newburgh is a pastoral city located 15 miles north of West Point, on the shore of the Hudson River. It is 60 miles from Manhattan and nearly 90 miles from Laufer's principal place of business in Baldwin, New York.[5] When undersigned counsel first met Laufer in early 2021, undersigned counsel was told by another attorney to put the address of the Newburgh house on any engagement letter. *See* Exh. A (sworn declaration of Aaron M. Katz). Undersigned counsel, however, has never sent mail to the Newburgh house, nor was he ever requested to send mail to the Newburgh house. Indeed, in prior non-privileged conversations with undersigned counsel, Laufer described the Newburgh house as essentially a getaway place that he uses on occasional weekends or when he needs a respite. *See id*. Nevertheless, in his self-serving sworn declaration, Laufer calls the Newburgh house his "principal residence." Even if Laufer honestly believes that the Newburgh house is his "principal residence," however, that is legally irrelevant to whether the summons and complaint were effectively served under Federal Rule of Civil Procedure 4(e)(1) and Massachusetts Rule of Civil Procedure 4(e)(3). Those rules do not require that service by signature-required mail be made to the defendant's "principal residence." They require, at most, that service be made to a "usual place of abode," of which a defendant can have multiple at the same time. *See infra* at 8-9 (discussing the pertinent case law). Equally irrelevant is whether Laufer personally signed for the Federal Express delivery, or whether another individual with general authorization to accept mail on Laufer's behalf signed for it. *See United States v. Ayer*, 857 F.2d 881, 887 (1st Cir. 1988) (holding that Massachusetts Rule of Civil Procedure 4(e)(3) and 4(f) do not require the defendant himself to have signed for the delivery).

---

[5] By comparison, Monsey is roughly 55 miles from Baldwin.

The irony of Laufer's meritless attempt to cast doubt on the effectiveness of AKL's service of the summons and complaint is so thick that it can be cut with a knife. In a lawsuit filed against Laufer in New York state court in 2020, a process server personally served the summons and complaint on a "John Doe" present at the Newburgh house. Two months later, Laufer asserted that the service to the Newburgh house did not provide him any notice of the lawsuit and that he did not find out about the lawsuit until his attorney somehow "found [the] action on NYSCEF."[6] *See* Exh. E (affidavit of process server Kevin Hawthorne and affidavit of Issac Laufer in the matter of Chava Laufer v. Issac Laufer). It is ironic in the extreme that, in this lawsuit, Laufer is suggesting that only delivery to the Newburgh house would have sufficed under the applicable procedural rules (a suggestion that has no legal merit whatsoever). It is also telling that Laufer's self-serving sworn declaration avoids any mention of (i) how many days per week he typically spends at the Newburgh house as compared to his Manhattan apartment and Monsey estate; (ii) where he stayed on September 27, 2023, the day that the summons and complaint were delivered to both his Manhattan apartment and Monsey estate; (iii) who was present at the Monsey estate at 8:11 pm on September 27, 2023, which is when the delivery of the summons and complaint was made to the Monsey estate;[7] (iv) where he stayed during the 21 days between September 27, 2023 and October 18, 2023; (v) when precisely he learned of the delivery of the summons and complaint to his Manhattan apartment and his Monsey estate; and (vi) why

---

[6] Undersigned counsel was aware of this prior to determining that service should be made to Laufer's apartment in Manhattan and his home in Monsey.

[7] In his self-serving sworn declaration, Laufer claims that the "L., Issac" who signed for the Federal Express delivery at 8:11 pm on September 27, 2023 was not him and that he does not know who signed for the delivery. It strains credulity that, if it was not Laufer himself who signed for the delivery, Laufer could not easily ascertain who the signatory was.

November 10, 2023 was the first time that he or his counsel even bothered to contact AKL regarding the lawsuit.

## II.     APPLICABLE LEGAL STANDARD

"Pursuant to Rule 55(c) of the Federal Rules of Civil Procedure, an entry of default may only be set aside '[f]or good cause shown.'" *Mach*, 187 F.R.D. at 18 (Saris, J.) (quoting *General Contracting & Trading Co. v. Interpole, Inc.*, 899 F.2d 109, 112 (1st Cir. 1990), and denying the defendant's Rule 55(c) motion). "Relevant factors to be considered in determining 'good cause' include: 'whether the default was willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented.'" *Id.* (quoting *Coon v. Grenier*, 867 F.2d 73, 76 (1st Cir. 1989)). "A court may also consider the explanation for the default, the good faith of the parties, the amount of money involved, and the timing of the [Rule 55(c)] motion." *Id.* Ultimately, however, "Rule 55(c) determinations are case-specific. They must, therefore, be made in a practical, commonsense manner, without rigid adherence to, or undue reliance upon, a mechanical formula." *General Contracting*, 899 F.2d at 112.

An appellate court reviews a "district court's denial of a [defendant's] Rule 55(c) motion" only for an abuse of discretion, and the appellate court will not reverse such a denial "unless it is 'clearly wrong.'" *KPS & Associates, Inc. v. Designs by FMC, Inc.*, 318 F.3d 1, 11 (1st Cir. 2003) (affirming the district court's denial of the defaulted defendant's Rule 55(c) motion); *see General Contracting*, 899 F.2d at 112-113 (holding that the district court's denial of the defaulted defendant's Rule 55(c) motion was "well within the province of the court's discretion . . . notwithstanding the presence of arguably meritorious defenses," because the defendant's "default was the product of 'negligence com[ing] perilously close' to willfulness").

**III. ARGUMENT**

Laufer fails to provide any adequate justification for why he should be relieved of the consequences of his willful "Rip Van Winkle strategy to this litigation." *Mach*, 187 F.R.D. at 18 (Saris, J.) (denying defaulted defendant's Rule 55(c) motion). As explained below, the deliveries of the summons and complaint to Laufer's Manhattan apartment and Monsey estate plainly constituted effective service of process under the applicable procedural rules. Moreover, in his sworn declaration, Laufer essentially admits that, while on *actual notice* of the lawsuit and the delivery of the summons and complaint to his Monsey estate, he made a willful decision not to answer the complaint by the October 18, 2023 deadline and instead to sit on his hands until November 10, 2023. Given the flagrant nature of Laufer's failure to abide by clear-as-day filing deadlines, the Rule 55(c) factors on balance clearly favor AKL.

**A. AKL's Service of Process Was Effective**

Federal Rule of Civil Procedure 4(e)(1) provides that "an individual . . . may be served in a judicial district of the United States by[ ] following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located . . . ." In other words, AKL was entitled to serve Laufer by following the Commonwealth of Massachusetts's service of process rules. Massachusetts Rule of Civil Procedure 4(e)(3) provides that where, as here, the defendant resides outside the Commonwealth, service may be accomplished "by any form of mail addressed to the person to be served and requiring a signed receipt . . . ." Mass. R. Civ. P. 4(e)(3). Massachusetts Rule of Civil Procedure 4(f) provides that "[w]hen service is made by mail, proof of service shall include a receipt signed by the addressee *or such other evidence* of personal delivery to the addressee as may be satisfactory to the court." Here, the summons and complaint were mailed, via Federal Express direct signature required, to

*two* of Laufer's residences—Laufer's Manhattan apartment and his Monsey estate. *See* ECF No. 4-1. Both deliveries were accomplished on September 27, 2023. *See* ECF No. 4-2 (Federal Express signed receipt for the delivery to the Monsey estate); Exh. C (Federal Express signature receipt for the delivery to the Manhattan apartment). These deliveries constituted proper and effective service of process, and Laufer has no serious argument otherwise.

<u>First</u>, under well-established First Circuit law, it is irrelevant whether the Federal Express deliveries to Laufer's Manhattan apartment and his Monsey estate were signed for by Laufer himself, as opposed to another individual whom Laufer had authorized to accept mail for him. In *United States v. Ayer*, 857 F.2d 881, 887 (1st Cir. 1988), the defendant's residence was "the Ritz Towers," where "all mail . . . was received at the front desk." The First Circuit held that Massachusetts Rule of Civil Procedure 4(e)(3) was satisfied where the Ritz Tower's front desk "clerk . . . signed for the certified mail delivery . . . ." *Id.* The First Circuit explained that "the clerk's signature on the postal receipt could be considered 'other evidence of personal delivery' adequate to show that satisfactory service on [the defendant] had been accomplished," and therefore "the district court did not abuse its discretion in refusing the vacate the [default] judgment entered in consequence of such service." *Id.* Here, copies of the summons and complaint were delivered, direct signature required, to *two* separate residences that Laufer keeps and regularly utilizes—his three-bedroom apartment in Manhattan and his custom-built estate in Monsey. The delivery of the summons and complaint to Laufer's Manhattan apartment—which is in an exclusive doorman building called "The White House"—was signed for by "R., Rich." Exh. C. Undersigned counsel has confirmed that "R., Rich" is an individual who works at the building's service desk. *See* Exh. A (declaration of Aaron M. Katz). And the delivery to Laufer's Monsey estate was accomplished at 8:11 p.m. on that same day, with an electronic chicken scratch signature

10

being provided by "L., Issac." *See* ECF No. 4-2. Laufer is a divorced man with adult children. If the "L., Issac" who signed for the delivery at the Monsey estate was not Laufer himself, then it obviously must have been someone whom Laufer had authorized to be in his home at 8:11 pm on a Wednesday (*e.g.*, Laufer's personal assistant Kevin).[8] Simply put, *Ayer* controls.

Laufer's memorandum of law tellingly fails to cite *Ayer*. Instead, Laufer's memorandum cites to (i) *Brown v. Gascard Club, Inc.*, 1986 WL 13076 (D. Mass. Nov. 4, 1986), which pre-dates *Ayer* and involved a plaintiff's attempt to serve the defendant (a traveling sales representative) by mailing the summons and complaint to a business office that the defendant rarely frequented, and (ii) *Blair v. City of Worcester*, 522 F.3d 105, 111 (1st Cir. 2008), which did not involve either service by mail to the defendant's residence or Massachusetts Rule of Civil Procedure 4(e)(3). *Gascard* and *Blair* are not remotely supportive of Laufer's arguments regarding the sufficiency of AKL's service of the summons and complaint. Laufer's reliance on those cases confirms that he is just desperately groping for an excuse for his dilatory conduct.

Second, whether Laufer subjectively considers his Newburgh house to be his "principal residence" is likewise irrelevant. As an initial matter, tellingly absent from Laufer's self-serving declaration is any mention of (i) how many nights he spends each week at his Newburgh house, versus how many nights he spends each week at his Manhattan apartment and Monsey estate, or even (ii) which of his residences he was at on September 27, 2023 and the days immediately following. In any event, Massachusetts Rule of Civil Procedure 4(e)(3) does not limit service by

---

[8] Notably absent from Laufer's sworn declaration is any assertion that he was not present at his Monsey estate soon after the Federal Express delivery was made, or even that he was not present at his Monsey estate *when* the Federal Express delivery was made. Laufer's declaration also fails to make any representations about *who* was at the Monsey estate at 8:11 pm on September 27, 2023, which is a fact that Laufer easily could ascertain.

mail to the defendant's "principal residence" or "primary residence." Even if Rule 4(e)(3) were read to implicitly incorporate Massachusetts Rule of Civil Procedure 4(d)(1)'s "usual place of abode" requirement, Laufer's Manhattan apartment and Monsey estate each would unquestionably satisfy that requirement. For "purposes of effecting service under rule 4(e), an individual can have multiple 'dwelling houses or usual places of abode,' provided each contains sufficient indicia of permanence.'" *United States v. Tobins*, 483 F. Supp. 2d 68, 76 (D. Mass. 2007) (Dein, M.J.) (quoting *Jaffe Asher v. Van Brunt*, 158 F.R.D. 278, 280 (S.D.N.Y. 1994)); *see Curley v. Radow*, No. 00-cv-10956, 2007 WL 2060015, at *5-9 (D. Mass. July 16, 2007) (O'Toole, J.) (same); *see also Norris v. Causey*, 869 F.3d 360, 368 (5th Cir. 2017) (holding that, for purposes of service of process, "a person can have two more [places of abode], provided each contains sufficient indicia of permanence"). In statements made to undersigned counsel, Laufer has confirmed that he "typically" stays at his Manhattan apartment "mid week," Exh. D (text from Laufer to Katz), and has referred to his Monsey estate as "[his] house." Exh. A (declaration of Aaron M. Katz).

Laufer cannot truthfully deny that he regularly stays at both his Manhattan apartment and his Monsey estate. This presumably is why his sworn declaration lacks any such denial. Indeed, undersigned counsel would be surprised if the Monsey estate were not the residence where Laufer spends more nights per week than anywhere else. At a minimum, Laufer clearly treats the Monsey estate as a "usual place of abode" as defined by the applicable case law. When undersigned counsel prepared Laufer to provide sworn testimony in response to a Civil Investigative Demand issued by the U.S. Attorney's Office for the Southern District of New York, the preparation sessions took place at the Monsey estate, at Laufer's specific request. *See* Exh. F. In the scheduling emails, the Monsey estate was referred to as Laufer's "home." *Id.* (redacted scheduling email from Eileen

12

Churchill to undersigned counsel).[9] During those preparation sessions, undersigned counsel stayed at the Monsey estate overnight at Laufer's invitation, and it was obvious that Laufer treated the Monsey estate as his home. The estate was filled with unique and beautiful custom furnishings, outfitted with a massive home gym, and stocked with fresh food in the kitchen. Laufer described to undersigned counsel how he used the kitchen to prepare kosher meals, including Shabbat meals that he hosted for members of his family. *See* Exh. A (declaration of Aaron M. Katz). During undersigned counsel's stay, visitors to the home included a local Rabbi, Laufer's personal assistant Kevin (who ostensibly is responsible for completing Laufer's administrative tasks and errands in and around Monsey), and a car salesman from whom Laufer had recently purchased a car. *See id.* Laufer also explained that many of his family members lived close by, which was important to him. *See id.* As recently as April 21, 2023, Laufer sent undersigned counsel WhatsApp messages discussing a Shabbat dinner that he was hosting for his adult children that night. Laufer sent a undersigned counsel a photograph of the meal he had cooked, and the plates were laid out on a white marble island that is clearly identifiable as the Monsey estate's kitchen island. *See id.* In short, Laufer clearly treats his Monsey estate as a "usual place of abode" for purposes of service of process.[10]

---

[9] Ms. Churchill's email refers to Laufer's "home" as 34 Astor Place, Wesley Hills, NY. Ms. Churchill's email is referring to the Monsey estate. Wesley Hills is a village of Monsey.

[10] In a recent lawsuit that a catering company filed against Laufer in New York state court for non-payment of the caterer's invoices, the summons and complaint was left with a "John Doe" at Laufer's Monsey estate. Laufer did not deny that the service on the "John Doe" at the Monsey estate was effective. Instead, his counsel timely filed a stipulated extension of time to file an answer, demonstrating both that Laufer knows how to comply with procedural deadlines when he wants to and that his challenge to AKL's service of process strains credulity well past its breaking point. *See* Exh. G (affidavit of service in Sage Events LLC v. Laufer et al., and Laufer's timely-filed stipulation of an extension of time to file an answer).

### B. The Rule 55(c) Factors Clearly Weigh in AKL's Favor

The reason Laufer strains so hard to deny that the summons and complaint were effectively served is because the Rule 55(c) factors on balance clearly weigh in AKL's favor.

First, Laufer's self-serving declaration makes clear that his failure to timely answer AKL's complaint was willful. Laufer had actual notice of the lawsuit the day after it was filed (which is proven by the statements his spokesperson at Kasowitz made to the Law360 reporter), as well as actual notice of the Federal Express delivery of the summons and complaint to his Monsey estate (which is proven by Laufer's own sworn declaration). Laufer simply chose to roll the dice that he could get away with ignoring AKL's lawsuit and blowing the October 18, 2023 answer deadline, just as he chose to roll the dice that he could get away with paying $0 for the legal services that AKL performed between March 1 and June 23, 2023. The dilatory conduct that resulted in the default entry against Laufer was at least as flagrant as the "Rip Van Winkle strategy" that this Court penalized with a default judgment in *Mach*. In *Mach*, as here, the defendant had actual notice of the plaintiff's lawsuit, then blew the deadline for filing an answer or responsive pleading, and then waited until 14 days after the entry of default to file a Rule 55(c) motion arguing that it had not been properly served. *See Mach*, 187 F.R.D. at 15-18 (Saris, J.). Indeed, a close reading of the facts in *Mach* suggest that Laufer's dilatory conduct here was even *more* flagrant than the defendant's conduct in *Mach*.

Second, although Laufer's self-serving declaration states in conclusory terms that, if his Rule 55(c) motion were granted, he would defend against AKL's lawsuit by contesting the reasonableness and accuracy of AKL's outstanding invoices, his declaration provides absolutely no facts suggesting that those "defenses" would have any merit whatsoever. Laufer has not paid AKL even *one penny* for the work that AKL performed on Laufer's behalf between March 1, 2023

14

and June 23, 2023, a period during which AKL was performing—at Laufer's request and with Laufer's knowledge—several streams of necessary litigation work in a lawsuit where the United States is suing Laufer and his companies for hundreds of millions of dollars in False Claims Act damages.[11] The reason Laufer's declaration fails to provide such facts is because such facts do not exist—and Laufer knows it. Indeed, Laufer knows that AKL's invoices *understated* the amount of time that AKL's founding partner Aaron Katz (a Chambers-rated False Claims Act litigator who was an equity partner at Ropes & Gray LLP from 2013 through 2022) and his colleague Keira Zirngibl (a 2016 honors graduate of Harvard Law School) spent working on Laufer's behalf. This is why Laufer never raised any challenges or objections to a single time entry on any of AKL's invoices. *See* Exh. A (declaration of Aaron M. Katz). Instead, beginning with the invoice that AKL issued on April 2, 2023 for work performed during March 2023, Laufer simply ignored the invoices, allowing AKL to continue to labor for the next 12 weeks under the assumption that it would be paid for its ongoing work. *Id.* The only "question" that either Laufer or any of his representatives ever raised to AKL is why AKL's invoices reflect quarter-hour billing increments. That question—which Laufer's business subordinate Jay Itzkowitz disingenuously asked undersigned counsel *on August 1, 2023*, see Exh. H—was answered by the unambiguous, conspicuous terms of the AKL engagement letter that Laufer, in his November 10, 2023 filings, *concedes* is an enforceable contract. *See* ECF No. 11-1, at 3 (engagement letter provision stating "[w]e will bill for our time in quarter-hour increments").

---

[11] Under Massachusetts law, pre-judgment interest in a breach of contract case is 12% per annum. Thus, even in the extraordinarily unlikely scenario that Laufer could successfully challenge AKL's invoices on the margins, the additional pre-judgment interest that would accrue on AKL's unpaid invoices would swallow up any marginal reductions to the invoices' principal amounts. In any event, AKL stands by its representations in the complaint that the invoices it issued to Laufer *understated* AKL's time and entirely reflect reasonable work that was performed efficiently and in a high quality manner.

15

To the extent Laufer seeks to characterize the arbitration provision in AKL's engagement letter as a potential "defense" to AKL's lawsuit, that "defense" is frivolous as well. This is because Laufer's willfully dilatory conduct waived his right to invoke the arbitration provision. The day that Katz moved to withdraw his appearance in the False Claims Act lawsuit, he re-sent copies of AKL's outstanding invoices via email to Laufer's business subordinate Jay Itzkowitz. *See* Exh. I (redacted email attaching invoices). Nearly a month then went by without any communication from Laufer or any of his representatives, or any payments. On July 18, 2023, Katz followed up with Itzkowitz and Ross, asking them for "an update regarding [the] invoices . . . ." Exh. J. The next day, Itzkowitz responded, "I will find out if the attorney has finished reviewing them yet." *Id.* Itzkowitz did not identify the "attorney" who was reviewing the invoices. Itzkowitz then went dark yet again. On July 24, 2023, AKL asked Laufer, via a letter emailed to Laufer and Itzkowitz, whether he wished to invoke the engagement letter's arbitration provision. AKL's letter stated that, if Laufer did not respond to AKL's query, AKL would treat this as an assertion by Laufer that he did not wish to invoke the arbitration provision. *See* Exh. K (July 24, 2023 letter that AKL emailed to Laufer and Itzkowitz). Laufer completely failed to respond, either personally or through a representative. Two weeks later, AKL proceeded with this lawsuit on the assumption that Laufer did not wish to invoke the arbitration provision. This assumption was entirely reasonable. The engagement letter's arbitration provision is both highly favorable to AKL and almost certainly would result in Laufer bearing significant additional costs. *See* ECF No. 11-1, at 5 ("You further agree that the arbitrator shall be Eric D. Green of Resolutions, LLC or, if Mr. Green is unavailable . . . , another qualified AAA or JAMS arbitrator of Aaron Katz Law LLC's choosing. . . . You further agree that the costs of the arbitration will be borne 50/50 or, if the arbitrator determines that the losing party proceeded in bad faith, by the losing party entirely.").

16

Accordingly, the engagement letter's arbitration provision is precisely the type of arbitration provision that Laufer might not wish to enforce under the circumstances here.

Laufer then continued to play Rip Van Winkle for another three months, suddenly awakening on November 10, 2023, essentially on the eve of the default entry turning into a default judgment. In similar circumstances, the First Circuit has held that this type of willfully dilatory conduct constitutes a waiver of the right to invoke an otherwise enforceable arbitration provision. *See Menorah Ins. Co. v. INX Reinsurance Corp.*, 72 F.3d 218, 220 (1st Cir. 1995) (finding waiver where the defendant initially declined an invitation to arbitrate, then allowed a default to be entered against it, and then sought to invoke the arbitration clause on the eve of having a default judgment entered against it). That Laufer should not be permitted to suddenly and strategically weaponize the arbitration provision to set aside a default entry and avoid a default judgment is even more clear in the wake of *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708 (2022). *Morgan* holds that a defendant's dilatory conduct waives his right to invoke a contract's arbitration provision, even where the dilatory conduct did not actually prejudice the plaintiff.[12] *Id.* Here, Laufer's extraordinary delay in invoking the arbitration provision—invoking it for the first time in a Rule 55(c) motion filed nearly four months after AKL initially asked Laufer whether he wished to arbitrate his non-payment of AKL's outstanding invoices—is even more pronounced given that, if

---

[12] In any event, Laufer's dilatory conduct *has* prejudiced AKL. If Laufer had told AKL back in July 2023 that he wished to arbitrate his nonpayment of AKL's outstanding invoices, AKL would have immediately initiated an arbitration. The Court should not allow Laufer, in mid-November 2023, to suddenly wield the engagement letter's arbitration provision as a weapon to avoid a default judgment and to further delay payment of AKL's outstanding invoices. And, if the Court does allow Laufer to weaponize the arbitration provision in this cynical fashion, the Court should enter a finding that Laufer is judicially estopped from later denying that the AKL engagement letter is an enforceable contract to which Laufer assented.

17

Laufer really had a legitimate objection to any of the time entries on any of AKL's outstanding invoices, he could have raised those objections soon after the invoices were issued.

Third, removing the default entry so that Laufer can waste time pursuing "defenses" that are pyrrhic at best (because the 12% statutory pre-judgment interest would swallow up any marginal reductions that Laufer could hope to get on the principal amount of the unpaid invoices) and utterly frivolous at worst (because Laufer in fact has no good faith objections to AKL's invoices) definitely would prejudice AKL. AKL is a year-old, two-member litigation boutique that depends upon clients' timely payment of their bills. AKL's founding partner Aaron Katz, who by necessity is acting as AKL's counsel of record in this case, has wasted a substantial amount of his time seeking to collect payment from Laufer—first by politely asking Laufer and his business subordinates when AKL could expect payment, then by making pre-litigation letter demands for payment, and finally by filing this lawsuit. If Katz is forced to expend time responding to the frivolous "defenses" to which Laufer's self-serving declaration vaguely refers, it will cause significant disruption to AKL's business and its ability to serve its current and future clients. Moreover, given that Laufer is the lead defendant in an intervened False Claims Act lawsuit seeking hundreds of millions of dollars in damages, removing the default entry and allowing Laufer to continue to delay payment of AKL's invoices has the very real potential to impair AKL's ability to collect on a judgment. In short, although AKL is confident that Laufer presently has the ability to pay the judgment that AKL seeks ($104,528.58 plus interest), there is a very real risk that AKL would have substantial difficulty collecting on a judgment if the False Claims Act lawsuit first concludes with a substantial settlement.

## IV. CONCLUSION

For the reasons stated above, Laufer's motion to set aside the default entry should be denied, and a default judgment should be granted. AKL also respectfully requests that the Court exercise its inherent authority to order that Laufer pay the imputed attorney's fees that AKL incurred in briefing this motion (*i.e.*, an amount equal to the hourly rate that Laufer, pursuant to the AKL engagement letter, had agreed to pay for undersigned counsel's time multiplied by the number of hours that undersigned counsel spent drafting this memorandum).

Respectfully submitted,

*/s/ Aaron M. Katz*
Aaron M. Katz
AARON KATZ LAW LLC
399 Boylston Street, 6th Floor
Boston, MA 02116
(617) 915-6305
akatz@aaronkatzlaw.com

*Counsel to Aaron Katz Law LLC*

DATED: November 11, 2023

## CERTIFICATE OF SERVICE

    I, Aaron M. Katz, certify that a copy of the foregoing memorandum, including exhibits, was sent to Damien Powell, counsel of record to Issac Laufer, via the CM/ECF system on November 11, 2023.

                                                  */s/ Aaron M. Katz*