# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| AARON KATZ LAW LLC, | |
| Plaintiff, | **Case No. 23-CV-11801-PBS** |
| v. | |
| ISSAC LAUFER, | **ORAL ARGUMENT REQUESTED** |
| Defendant. | |

## OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS OR TO COMPEL ARBITRATION

Defendant Issac Laufer ("Laufer") is a self-made entrepreneur who is one of most financially successful nursing home operators in the New York metropolitan area. He is also a recidivist non-payer of reasonable attorneys' fees that he and/or the businesses he owns incur for essential legal services provided by nationally recognized litigators. Aaron Katz Law LLC ("AKL") unfortunately is one of the law firms that Laufer and his businesses have failed to pay without justification.[1]

Laufer willfully chose to disregard the clear October 18, 2023 deadline for answering AKL's complaint, and so the Court entered a default against him on October 27, 2023. *See* ECF No. 6 (default entry); ECF No. 14 (opposition to Laufer's motion to set aside the default). Despite his present status as a defaulted defendant, Laufer filed on November 10, 2023 a motion to dismiss the complaint and to compel arbitration based on the mandatory arbitration provision contained in

---

[1] Laufer's history of not paying the lawyers that he retains for himself or the businesses he owns and controls—including at least one top-rated BigLaw firm headquartered in Chicago that worked on the same False Claims Act matter that AKL did—is directly relevant to Laufer's motion to dismiss, as further explained below.

the AKL engagement letter to which Laufer assented in October 2022. Laufer is correct that the AKL engagement letter is a binding contract between the parties. But his motion to dismiss/compel nevertheless should be denied for two reasons.

First, unless and until the Court grants the meritless Rule 55(c) motion that Laufer filed on November 10, 2023 (which the Court should not), Laufer is a defaulted defendant who is not entitled even to file a Rule 12 motion, let alone prevail on one. Second, Laufer waived his right to invoke the engagement letter's arbitration provision—a provision that is extraordinarily favorable to AKL, especially on these facts—by repeatedly and consistently acting in a manner utterly inconsistent with a legitimate desire to arbitrate (though logically consistent with a desire to avoid the 100% cost-shifting rule that the arbitration provision imposes on a losing party who proceeded in bad faith). Laufer's inconsistent conduct included (i) failing to raise any objection at any time to any of the time entries on any of the AKL invoices that Laufer simply has refused to pay without explanation, (ii) failing to invoke the arbitration provision in response to AKL's pre-lawsuit letter demands for payment, (iii) failing to respond to AKL's specific pre-lawsuit query regarding whether Laufer wished to arbitrate his unjustified non-payment of AKL's invoices, (iv) failing to invoke the arbitration provision until 95 days after learning of AKL's complaint, and (v) defaulting on AKL's complaint by willfully failing to file an answer or responsive pleading by the October 18, 2023 deadline prescribed by the Federal Rules of Civil Procedure. Courts have found that this sort of willfully dilatory conduct by a defendant will constitute a waiver of an arbitration provision that the defendant otherwise could have invoked. *See infra*.

It is unfortunate that Laufer put AKL in the position of having to file this lawsuit. But, unlike large law firms Laufer or his businesses have failed to pay without justification, AKL is a two-member firm that cannot simply write off as a "rounding error" the unpaid invoices that Laufer

has failed to pay without any justification or even explanation. Laufer's belated motion practice, after a default was entered against him, is simply a Hail Mary attempt to further delay payment of AKL's unpaid invoices and to exacerbate a collection burden that AKL never should have had to bear in the first place. The Court is not required to put up with Laufer's gamesmanship, and AKL respectfully submits that the Court should not put up with it.

## I. RELEVANT FACTUAL BACKGROUND

To properly assess whether Laufer's substantial delay in invoking the AKL engagement letter's arbitration provision—a provision that Katz drafted to be extraordinarily favorable to AKL, and extraordinarily unfavorable to a client who proceeds in bad faith—constitutes a waiver, and whether Laufer's eleventh-hour attempt to invoke the arbitration provision is merely a tactical attempt to evade a default judgment and further delay paying the debt he owes to AKL, it is important for the Court to understand the factual background of Laufer's engagement of AKL, the basic nature of the work for which AKL unjustifiably has not been paid, and Laufer's behavior when AKL repeatedly asked him in June and July 2023 whether he intended to pay the unpaid and long past-due invoices.

### A. Aaron Katz's and AKL's Representation of Laufer in the FCA Matter

Laufer is one of the most financially successful independent nursing home operators in the New York metropolitan area. The United States, however, believes that Laufer has achieved that financial success through fraud. Laufer is the lead defendant in an intervened False Claims Act lawsuit that remains pending in the Southern District of New York (the "FCA matter"). The United States is seeking hundreds of millions of dollars in damages in the FCA matter. Laufer's co-defendants in the FCA matter are eleven skilled nursing facilities that he owns (in some instances wholly) and a skilled nursing facility management company that he wholly owns.

In early 2021, Laufer retained undersigned counsel Aaron Katz ("Katz") to represent him in the FCA matter. At the time, the FCA matter was in the late stages of the pre-intervention investigation phase (*i.e.*, the U.S. Attorney's Office was investigating a *qui tam* complaint that was still under seal). *See* Exh. A (sworn declaration of Aaron M. Katz). Katz is a Chambers-rated litigator who has represented some of the country's leading healthcare companies in False Claims Act investigations and litigation, including Biogen, AbbVie, Express Scripts, Covidien, Omnicare/CVS, IASIS Healthcare, Long Island Jewish Health System, Westchester Medical Center, eClinicalWorks, and Modernizing Medicine. *Id.* At the time Laufer retained him, Katz was an equity partner at Ropes & Gray LLP. *Id.*

In June 2021, the United States intervened in the *qui tam* complaint and filed an intervenor complaint naming Laufer as the lead defendant.[2] *Id.* Katz accepted service of the complaint on Laufer's behalf and, shortly thereafter, filed a notice of appearance as Laufer's personal lead counsel. *Id.* No lawyer other than Katz filed a notice of appearance for Laufer at that time. *Id.* Lawyers from various other law firms filed notices of appearances on behalf of Laufer's corporate co-defendants, including former Assistant United States Attorney and current Goodwin Procter partner Miranda Hooker. *Id.*

On September 6, 2022, Katz informed Laufer that he would be resigning from Ropes & Gray on September 30, 2022 in order to launch AKL with his former Ropes & Gray colleague Keira Zirngibl ("Zirngibl"). *Id.* Laufer informed Katz that, upon Katz's resignation from Ropes & Gray, he would be disengaging Ropes & Gray and retaining AKL, so that Katz could continue serving as his personal lead counsel in the FCA matter. *Id.* Katz resigned from Ropes & Gray on September 30, 2022 and officially launched AKL on October 3, 2022. *Id.* Laufer engaged AKL,

---

[2] The relator's *qui tam* complaint also had named Laufer as the lead defendant.

and the engagement terms between Laufer and AKL were memorialized in an engagement letter dated October 7, 2022. *Id.* Laufer's engagement terms with AKL included an hourly billing rate for Katz that was substantially discounted from the hourly rate that Ropes & Gray previously had been charging Laufer for Katz's time. *Id.*

In October 2022, the FCA matter was just beginning to transition to the Rule 26 discovery phase. *Id.* The United States and the defendants, including Laufer, exchanged Rule 26(a)(1) initial disclosures on December 1, 2022. *Id.* The parties exchanged their first tranches of discovery requests on December 9, 2022. *Id.* With respect to Laufer in his personal capacity, the United States served a Request for Production seeking production of 23 categories of documents (excluding sub-categories), with the "relevant time period" being defined as January 1, 2010 through the present. *Id.* On February 3, 2023, the United States served on Laufer in his personal capacity 10 interrogatories (excluding subparts), as well as a Second Request for Production seeking all documents referred to or relied upon in Laufer's interrogatory answers. *Id.*

On March 30, 2023, Laufer informed Katz that he was considering adding to the joint defense team former Kasowitz Benson & Torres ("Kasowitz") partner Eric Herschmann and current Kasowitz Benson & Torres partner Daniel Benson. *Id.* Laufer did not at that time indicate what role Herschmann and Benson would take on the FCA matter, including whether they would be making appearances or which defendant(s) they would be representing. *Id.* On April 20, 2023, Laufer sent Katz a voice message via WhatsApp stating that he had formally retained Herschmann and Kasowitz that morning and that by the "end of the month or so" he wanted "to have [the joint defense team] configured the right way." *Id.* On May 1, 2023, Laufer sent Katz a WhatsApp voice message stating that he was "more relaxed about this whole situation." *Id.* In that same WhatsApp voice message, Laufer said that he felt other law firms had been "taking advantage of [him] for so

5

long" but "I know it's not you, definitely not since, you know, you did your own thing, you left [Ropes & Gray]," and that he would soon "be in a much better state of mind to be able to, like, discuss [the case] better with you and Eric [Herschmann] and Dan [Benson]." *Id.*

On May 3, 2023, Katz appeared for Laufer at a motions hearing before the Magistrate Judge. *Id.* Neither Herschmann nor Benson nor any other Kasowitz lawyer attended the hearing. *Id.* At the hearing, the Magistrate Judge granted an important discovery request that Katz had made on Laufer's behalf and that the United States had opposed. *Id.* After Katz informed Laufer of the result, Laufer wrote a WhatsApp message to Katz stating, "Oh wow! That's awesome! Shows the judge is sympathetic to our overall position, I would think." *Id.*

On May 15, 2023, Herschmann called Katz to inform him that Laufer wanted Katz, Herschmann, and Kasowitz to represent him in his personal capacity in the FCA matter. *Id.* Herschmann explained that, going forward, Laufer's management company Paragon would be represented by former Kasowitz partner Michael Bowen and that the skilled nursing facilities would be jointly represented by the law firm Bradley Arant (which previously had been representing only a subset of the facilities). *Id.* Herschmann also explained that several other law firms that had been working on the FCA matter would be withdrawing their appearances and exiting the FCA matter completely, including Goodwin Procter. *Id.*

During the remainder of May 2023, Katz and Zirngibl continued to perform work (i) responding to the Requests for Production and interrogatories that the United States previously prounded on Laufer; (ii) responding to specific requests from Kasowitz; and (iii) helping Kasowitz's team of lawyers (which by that point included Benson, partner Christian Becker, partner Andrew Kurland, and special counsel Amit Vora) get up to speed. *Id.*

On June 12, 2023, Katz learned that the Kasowitz lawyers, without informing Katz, had arranged and participated in a conference call with a potential expert witness (based in Boston) who Katz personally had identified and recruited months before. *Id.* This struck Katz as very odd. *Id.* Later that day, Katz advised Laufer via a WhatsApp message that Katz did not think it would "benefit" Laufer to have AKL remain as counsel of record in the FCA matter given that Kasowitz's large team of lawyers did not seem interested in collaborating with AKL. *Id.* Katz asked Laufer whether he should withdraw his appearance and simply "remain available to answer any questions that the Kasowitz lawyers may have going forward[.]" *Id.* On June 14, 2023, Katz clarified in a WhatsApp message to Laufer that he was happy to continue working in collaboration with Kasowitz, if that is what Laufer wanted. *Id.* Katz concluded his message to Laufer, "I want to do what **you** want." *Id.* On June 18, 2023, Laufer wrote a WhatsApp message to Katz stating, "Im [sic] going to peak [sic] with kasowits [sic] next week and see where we go." *Id.* On June 22, 2023, Laufer wrote to Katz via WhatsApp, "I think it's best if you withdraw and if they need you they'll call you, thank you." *Id.* That same day, Katz filed a motion to withdraw his appearance, and the district court granted the motion on June 23, 2023.

## B. AKL's Invoices for Services Rendered

Under the engagement terms between AKL and Laufer, Laufer agreed to time-based billing that AKL would invoice monthly. Exh. B (AKL engagement letter), at § 2. Laufer agreed that he would pay an hourly rate of $750 for Katz's time and an hourly rate of $450 for Zirngibl's time.[3] *Id.* AKL agreed that it would not raise these hourly rates until January 1, 2024 at the earliest. *Id.* Laufer also agreed that Katz and Zirngibl would "bill for our time in quarter-hour increments,

---

[3] Katz's hourly rate at Ropes & Gray in 2022 was approximately $1,300 per hour and was scheduled to increase to approximately $1,400 in 2023. Accordingly, Katz's move from Ropes & Gray to AKL resulted in an immediate financial benefit to Laufer.

rounding up to the next quarter-hour increment as applicable." *Id.* Katz told Laufer in early October 2022 that AKL would not bill Laufer for time that Zirngibl, who had not worked on the matter at Ropes & Gray, spent getting up to speed. *See* Exh. A (declaration of Aaron M. Katz).

Laufer paid in full each of the five monthly invoices that AKL issued for worked performed during October 2022, November 2022, December 2022, January 2023, and February 2023.[4] *Id.* Those invoices totaled $66,878.05. *Id.* Katz told Laufer and Laufer's business subordinate Jay Itzkowitz (the Chief Financial Officer of Laufer's management company Paragon Management SNF) on numerous occasions that Laufer's monthly legal expenses would run higher as discovery picked up speed. *Id.* Laufer confirmed he understood this. *Id.*

On February 21, 2023, iDiscovery Solutions—the document collection vendor jointly retained by AKL and the corporate co-defendants' counsel—began collecting Laufer's electronic data, in response to the United States's Requests for Production. *Id.* iDiscovery's engagement letter specified that its invoices would be sent directly to and paid by Paragon Management SNF. Due to the variety and complexity of the data sources at issue, iDiscovery's collection of Laufer's electronic data continued through mid-March 2023. *Id.* AKL's review of Laufer's electronic documents, for purposes of responding to the United States's Requests for Production, commenced in earnest shortly thereafter. AKL was, at the same time, reviewing materials that the United States had produced in response to discovery requests that AKL and other defendants had propounded on the United States, drafting discovery-related motions on behalf of the joint defense group, and preparing for and attending hearings before the Magistrate Judge. *Id.*

---

[4] The payments were made by paper checks issued by the eleven skilled nursing facilities that are Laufer's co-defendants in the FCA matter. Each facility paid a portion of the amount invoiced to Laufer. AKL's engagement letter allowed Laufer's invoices to be paid by an indemnitor (with Laufer remaining personally liable for all amounts), so AKL did not consider this problematic or concerning.

The volume of electronic materials collected from Laufer's various accounts and devices was massive (approximately one million documents). *Id.* To respond intelligently and efficiently to the United States's Requests for Production, AKL utilized (i) key word and "counterparty" filters to reduce the "review sets"; (ii) a team of low-cost contract attorneys, supplied by iDiscovery and billed to Paragon Management SNF pursuant to the iDiscovery engagement letter, who would conduct the first level review of the "review sets"; (iii) secondary review by Zirngibl and in some instances Katz of documents that the iDiscovery attorneys had flagged as "key"; (iv) targeted review by Zirngibl and Katz of potential "hot" documents (both exculpatory and inculpatory) that Zirngibl and Katz identified through targeted key word searches; and (v) an automated privilege filter. Katz and Zirngibl also performed targeted searches of Laufer's documents to identify certain categories of documents that could and should be legitimately excluded from any production to the United States. *Id.* On June 3, 2023, Katz advised Kasowitz that the "last tranche of the Issac Laufer document review set has been completed" and that iDiscovery "is now in a position to create production sets." *Id.*

Not surprisingly, AKL's strategic and painstaking work collecting, reviewing, and preparing for production Laufer's electronic documents resulted in an uptick in AKL's fees during the period of March 2023 through May 2023. *Id.* AKL is confident that it under-recorded the time Katz and Zirngibl spent on this work. *Id.* The March through May 2023 period also included drafting and filing of various discovery motions and multiple lengthy, contentious in-person hearings before the Magistrate Judge, hearings at which Katz was the only lawyer to appear for Laufer and was one of the most frequent speakers on the defense side. *Id.* Katz and Zirngibl also spent time during this period helping get Herschmann and the Kasowitz lawyers up to speed, including drafting summary memoranda specifically requested by Herschmann and Kasowitz. *Id.*

With respect to the invoices for March – May 2023, the invoice amount, issue date, and pay-by date were as follows:

| MONTH | AMOUNT | ISSUE DATE | PAY-BY DATE |
|-------|--------|------------|-------------|
| March 2023 | $36,010.58 | April 2, 2023 | May 19, 2023 |
| April 2023 | $33,075.00 | May 1, 2023 | June 16, 2023 |
| May 2023 | $31,017.50 | June 2, 2023 | July 14, 2023 |

*Id.* Of these amounts, about $1,300 were for expenses that Katz had incurred traveling to New York for court hearings or case-related meetings. *Id.* AKL also issued an invoice of $4,425.00 for work performed between June 1 and June 5, 2023. *Id.* This invoice was issued on June 22, 2023.[5] *Id.* AKL unilaterally chose not to bill Laufer for time spent on the FCA matter after June 5, 2023, which served to reduce that invoice. *Id.* This was the last invoice that AKL ever issued to Laufer. *Id.*

### C. Laufer's Failure to Pay AKL's Outstanding Invoices

The last AKL invoice that Laufer paid (either personally or via an indemnitor) was the invoice for work AKL performed in February 2023. *Id.* Laufer has paid $0 of the invoices issued for work AKL performed from March 2023 forward. *Id.* Yet, neither Laufer nor any of his representatives ever objected to a single time entry on any of AKL's invoices—including the unpaid invoices. *Id.* Indeed, neither Laufer nor any of his representatives ever objected to any invoice issued to him by Katz, including the Ropes & Gray invoices that Katz issued to Laufer prior to October 2022. *Id.*

---

[5] AKL's prior pleadings inadvertently overstated by 50 cents the principal amount of Laufer's unpaid invoices. Undersigned counsel apologies for that mathematical error.

10

On June 2, 2023, Katz wrote to Laufer's business subordinate Jay Itzkowitz regarding AKL's open invoices. Itzkowitz is the Chief Financial Officer of Paragon Management SNF, and Laufer had directed Katz to send AKL's invoices to Itzkowitz. *Id.* Katz wrote:



Jay,

Please find attached an invoice for services rendered to Issac in May. We have two prior invoices outstanding--one for March services, and one for April services. The invoice for March services is slightly past due--no big deal, I just wanted to flag in case it slipped through the cracks. I'm closing my Q2 books in a couple of weeks, in preparation for Q2 estimated tax payments, so I'm trying to get a sense of what invoices will be collected by then.

Thanks,
Aaron

*Id.* Itzkowitz never responded to the email. *Id.*

On June 12, 2023, Katz wrote to Laufer's business subordinate Fran Ross regarding AKL's open invoices. Ross's title is "A/P Supervisor," and she was one of Katz's points of contact with respect to invoices. *Id.* Katz wrote:



Fran,

I have three open invoices that I sent to Jay. One is nearly four weeks past due (invoice 1064, issued on April 2nd), and one is due this week (invoice 1080, issued on May 1st). With June 15th being the IRS's estimated tax payment deadline, I am hoping for some clarity about whether the invoices 1064 and 1080 will be received this week.

Thanks,
Aaron

*Id.* Ross responded that same day, "I will follow up with [Jay]." *Id.* After two days without further response from Ross, Katz wrote back to Ross, "I am assuming you do not have an update on this, but let me know if you do." *Id.* Ross responded, "Hi Aaron, Sorry, they are still being reviewed." *Id.*

On June 22, 2023, Katz re-sent copies of all of AKL's open invoices, including the $4,425 final invoice for work performed during the first five days in June, to Itzkowitz. *Id.* Itzkowitz acknowledged receipt and forwarded the invoices to Ross in a June 23, 2023 email on which Katz was copied. *Id.* Twenty-four days then went by without AKL receiving either payment or follow-up communication from Laufer, Itzkowitz, Ross, or any other Laufer representative. *Id.* On July 17, 2023, Katz emailed Itzkowitz and Ross regarding the by-then significantly and concerningly past-due invoices, writing: "Jay and Fran, I hope you are well. Can you please provide me an update regarding invoices 1064 (issued April 2nd), 1080 (issued May 1st), and 1091 (issued June 2nd)? Thank you, Aaron." *Id.* The next day Itzkowitz responded merely, "I will find out if the attorney has finished reviewing them." *Id.* Itzkowitz said nothing else and did not identify the "attorney" or when the "review" had begun. Katz then responded to Itzkowitz, "Thank you. These three invoices have about 110 time entries total—this number of lines should not take more than 30 minutes to review." *Id.* Itzkowitz then responded merely, "I understand. Do you have the retainer/engagement letter[?]" *Id.* Katz responded by sending Itzkowitz the AKL engagement letter. *Id.*

After another week went by without AKL receiving any payment, on July 24, 2023 Katz sent a letter to Laufer regarding the unpaid invoices, which he sent via email addressed to both Laufer and Itzkowitz. *Id.* The letter concluded:

> We continue to have faith that you intend to pay our invoices and will do so by July 31st (for the past-due invoices) and August 18th (for the final invoice). For the sake of obtaining the necessary clarity with respect to your intentions, however, we respectfully request that you advise us in writing by the close of business on Thursday, July 27th of the following: (1) whether you agree to pay the past-due invoices in full by July 31st and the final invoice in full by August 18th; (2) if you are disputing the invoices, the basis for the dispute and the amount you are disputing; and (3) if you are disputing your obligation to pay the invoices, whether you are demanding that the dispute be resolved pursuant to the mandatory arbitration provision contained in our October 7, 2022 engagement letter.
>
> If we do not receive a written response from you or Jay by the close of business on July 26th, we will consider such lack of response to be a representation that you do not intend to pay the invoices and that you will not be invoking the engagement letter's mandatory arbitration provision.
>
> We hope that this situation is resolved swiftly and amicably.
>
> Sincerely,
>
> 
>
> Aaron Katz

*Id.* Laufer never responded to the letter, including the letter's query about whether Laufer wished for any "dispute [over the unpaid invoices] [to] be resolved pursuant to the mandatory arbitration provision contained in our October 7, 2022 engagement letter." *Id.*

On August 1, 2023, Itzkowitz wrote an email to Katz with the subject line "Aaron Katz Law Outstanding Invoices." Itzkowitz wrote: "Hi Aaron, Your invoices were reviewed along with the engagement letter and the question arose as to why your law firm is billing us in quarter-hour increments as opposed to the usual tenth of an hour that the other attorneys are billing us. There is no reference to quarter hour increments in the engagement letter. Please advise."[6] *Id.* Itzkowitz's email did not raise any other "questions" about AKL's invoices. *Id.* Katz responded to Itzkowitz less than an hour later:

---

[6] Contrary to Itzkowitz's representation, one of the law firms that Laufer had retained to represent his management company was charging a $25,000 per month flat fee, and that law firm's monthly invoices did not include *any* line item time entries showing what work (if any) that law firm had performed during the month. *Id.*

<table>
<tr>
<td>**Aaron Katz** &lt;akatz@aaronkatzlaw.com&gt;</td>
<td>Tue, Aug 1, 12:52 PM   ☆   ↰   ⋮ </td>
</tr>
</table>

to Jay ▾

Jay,

Thank you for getting back to me.  The second to last paragraph of section 2 of the engagement letter states that we bill in quarter hour increments.  As a general matter, my practice has always been to round down and to not bill for discrete tasks that take less than 15 minutes and cannot be logically grouped with other tasks.

As a show of good faith, if Issac would like to commit to wiring me or FedEx'ing me payment by tomorrow, I am willing to take $100,000 as payment in full for the four outstanding invoices.

Aaron

*Id.*  Neither Itzkowitz nor Laufer, nor any of Laufer's representatives, ever responded to Katz's offer.  *Id.*  Nor did Itzkowitz or Laufer, or any of Laufer's representatives, ever follow up with any explanation for why Laufer had not paid AKL on its outstanding invoices.  *Id.*  Nor did Itzkowitz or Laufer, or any of Laufer's representatives, ever state to Katz that Laufer actually was disputing the invoices (as opposed to just flat ignoring them) and wished to arbitrate that dispute.  *Id.*

### D.  AKL Files the Complaint, and Laufer Defaults

AKL filed its complaint via the CM/ECF system on August 7, 2023.  *See* ECF No. 1.  On August 8, 2023, Laufer learned of the lawsuit after a Law360 reporter reached out to Kasowitz for comment on the lawsuit.  *See* Exh. C (Law360 article including a comment by a Laufer "spokesperson" at Kasowitz).  On or about August 17, 2023, AKL sent Laufer a request for waiver of service.  Exh. A (declaration of Aaron M. Katz).  Laufer failed to respond to that request.  *Id.*  On September 27, 2023, AKL served Laufer in compliance with Federal Rule of Civil Procedure 4(e)(1) and Massachusetts Rule of Civil Procedure 4(e)(3) and, on September 29, 2023, filed a "summons executed" on the electronic docket.  *See* ECF No. 4.  The minute entry for ECF No. 4 clearly states "answer due 10/18/23."  *Id.* (minute entry).

Laufer failed to answer AKL's complaint within the prescribed period of time, nor did he request an extension of time to answer. On October 24, 2023, AKL filed a request for notice of default. *See* ECF No. 5. On October 27, 2023, the Court entered a default. *See* ECF No. 6. On November 10, 2023, Hinkley Allen & Snyder partner Damien Powell ("Powell") emailed Katz regarding the lawsuit, asking for a meet and confer on Laufer's motions to set aside the default and to dismiss/compel arbitration on the basis of the engagement letter's arbitration provision. Powell's email was the first time that *anyone* affiliated with Laufer had contacted Katz or AKL regarding the lawsuit. *See* Exh. A (declaration of Aaron M. Katz). Indeed, it was the first time since *August 1, 2023* that anyone affiliated with Laufer had contacted Katz or AKL regarding the unpaid invoices. *Id.*

## II. APPLICABLE LAW

**1.** Unless an extension of time is granted, a defendant who has refused to waive service must "serve an answer within 21 days after being served with the summons and complaint." Fed. R. Civ. P. 12(a)(1)(A)(i). If a defendant wishes to move to dismiss a complaint for any of the reasons set forth in Rule 12(b), the defendant must file his motion to dismiss *before* the deadline for serving an answer has expired. *See* Fed. R. Civ. P. 12(b) ("A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed."); *Crispin-Taveras v. Municipality of Carolina*, 647 F.3d 1, 6 (1st Cir. 2011). Accordingly, a defaulted defendant is procedurally barred from filing a Rule 12(b) motion unless and until the district court sets aside the default pursuant to Federal Rule of Civil Procedure 55(c) and resets the applicable deadlines for submission of a responsive pleading. *Cf. Cent. Ill. Carpenters Health & Welfare Trust Fund v. Con-Tech Carpentry, Inc.*, 806 F.3d 935, 936 (7th Cir. 2015).

**2.** "[A]rbitration agreements [are] as enforceable as other contracts, but not more so." *Morgan v. Sundance, Inc.* 142 S. Ct. 1708, 1713 (2022). Where a defendant unreasonably delays in invoking a contract's arbitration provision, a district court is entitled to find that the defendant waived its right to invoke the provision, regardless of whether the delay "prejudiced" the plaintiff. *Id.* at 1714. The dispositive question is whether the defendant "knowingly relinquish[ed] the right to arbitrate by acting inconsistently with that right[.]" *Id.* In answering that question, a district court must look to a number of factors, but ultimately the task is to determine whether the "defendant's actions" were "inconsistent with seeking arbitration . . . ." *Crean v. Morgan Stanley Smith Barney, LLC*, No. 21-cv-11021, ECF No. 32, at p. 20 (Cabell, M.J.). A defendant's failure to timely file an answer or other responsive pleading to a complaint, where the defendant had actual notice of the complaint and made a willful decision not to comply with the applicable procedural deadlines, is a sufficient basis to find that the defendant waived his right to invoke a contract's arbitration provision. *See Charming Shoppes v. Overland*, 186 Misc. 2d 293 (N.Y. Sup. Ct. 2000) ("The defendant affirmatively accepted the judicial forum, and waived any right to stay the action based on arbitration clauses in the agreements, by its failure to comply with answering the complaint [by the prescribed deadline and being in default].").

## III.   ARGUMENT

Unless the Court grants Laufer's Rule 55(c) motion to set aside the default entry—which it should not, because the motion is meritless—then Laufer's motion to dismiss/compel is procedurally improper *per se* and must be denied on that ground alone. AKL has submitted a thorough memorandum of law in opposition to Laufer's Rule 55(c) motion, and so it will not repeat here the myriad reasons why the Court should deny Laufer's Rule 55(c) motion. This memorandum of law, therefore, focuses on the question of whether Laufer waived his right to

invoke the arbitration provision contained in the AKL engagement letter. As explained below, Laufer has waived that right.

**A. Laufer Waived His Right to Invoke the Arbitration Provision by Failing to Invoke It Until 14 days After the Entry of Default, Particularly Given That AKL Asked Laufer on July 24, 2023 Whether He Wished to Invoke the Provision and Laufer Has Known About AKL's Lawsuit Since August 8, 2023.**

The arbitration provision in AKL's engagement letter is extremely favorable to AKL. Specifically, it grants AKL the unilateral, veto-proof right to select the arbitrator. *See* Exh. B (AKL engagement letter), at § 7 ("You further agree that the arbitrator shall be Eric D. Green of Resolutions, LLC or, if Mr. Green is unavailable due to death, health, retirement, or conflicts, another qualified AAA or JAMS arbitrator of Aaron Katz Law LLC's choosing.").[7] The arbitration provision is also extremely *unfavorable* to a party whose position is frivolous and therefore proceeds in bad faith. Specifically, the provision provides that "the costs of the arbitration will be borne 50/50 or, if the arbitrator determines that the losing party proceeded in bad faith, by the losing party entirely." *Id.* In combination, that means that, in any arbitration, an arbitrator *handpicked* by AKL is the one to decide not only who wins the dispute, but also whether the *entire cost of the arbitration* shall be borne by the loser.

With that essential backdrop in mind, the Court should consider the following material facts, all of which are clearly documented and none of which can reasonably be disputed:

(1)     AKL issued the four unpaid invoices to Laufer (via email to Itzkowitz, as Laufer had directed) on April 2, May 1, June 2, and June 22, 2023. The four invoices contained a total of 110 time entries from two timekeepers (Katz and Zirngibl). *See* Exh. D (copies of the invoices, with privileged information redacted).

---

[7] Undersigned counsel can confirm that Eric Green is unavailable due to retirement.

**(2)** Neither Laufer nor anyone affiliated with Laufer ever raised an objection (or even a question) with respect to any of the time entries on any of AKL's invoices. *See* Exh. A (declaration of Aaron M. Katz).

**(3)** Laufer's business subordinates Itzkowitz and Ross represented to Katz, in writing, that an "attorney" was "reviewing" AKL's invoices. This "review" was first alluded to by Ross in her June 14, 2023 email to Katz and then expressly referenced by Itzkowitz in his July 18, 2023 email to Katz. *Id.*

**(4)** On August 1, 2023, ostensibly after the "attorney" had finished his "review" of AKL's invoices—a review that must have been comprehensive, given that the "attorney" took between two and six weeks to review a mere 110 time entries—the only "question" that was raised about AKL's invoices was why AKL used quarter-hour billing increments. *Id.* The answer to that question, of course, is that AKL's engagement letter—the very same AKL engagement letter on which Laufer's motion to dismiss/compel is predicated—clearly specified that Laufer would be billed in quarter-hour increments. *See* Exh. B, at § 2.

**(5)** To this very day, neither Laufer nor his army of lawyers has raised—either in a communication with AKL or a pleading filed with this Court—any specific objection to a single time entry on any of AKL's invoices, including the unpaid invoices. *See* Exh. A (declaration of Aaron M. Katz).

Given these undisputed facts, it is no mystery why Laufer did not invoke the arbitration clause in response to the letter that AKL sent to him on July 24, 2023, or after he first obtained actual knowledge of AKL's lawsuit on August 8, 2023, or within 21 days of AKL's lawsuit being served to his Manhattan apartment and his Monsey estate. The reason is because Laufer knows he has no

valid "defense" to his failure to pay AKL's invoices. His failure to pay AKL's unpaid invoices thus screams of bad faith. Accordingly, asking for this "dispute"[8] to be taken to arbitration certainly would have increased the overall costs to Laufer of failing to pay AKL's invoices, because an arbitrator handpicked by AKL almost certainly would shift all the costs of the arbitration on to Laufer (in addition to issuing other sanctions allowed under the applicable arbitration rules, including an award of attorneys' fees). Indeed, the fact that Laufer is a recidivist non-payer of legal fees—including total non-payment of the legal fees he and his businesses incurred to a top-ranked BigLaw firm headquartered in Chicago that performed work on the False Claims Act matter while it was still in the pre-intervention investigation phase[9]—makes Laufer's bad faith even more glaring. AKL's decision not to invoke the arbitration provision that AKL itself drafted was driven by a desire to avoid the absurd use of an arbitral forum for what essentially is a collection action against a client who has the means (but clearly not the desire) to pay. Ultimately, AKL's cost-consciousness will redound to Laufer's benefit, because Laufer would almost certainly have been made to bear 100% of the costs of any arbitration.

None of the "non-waiver" cases that Laufer cites in his brief remotely resemble the fact pattern that exists here. Laufer's eleventh-hour invocation of the AKL engagement letter's arbitration provision smacks of gamesmanship, an attempt to weaponize the provision to evade a default judgment of his (and his lawyers') own making and further delay the inevitable (*viz.*, full payment of AKL's invoices, plus interest and any sanctions deemed appropriate). A defendant who legitimately wishes to arbitrate a bona fide dispute with the plaintiff, and who has actual

---

[8] Calling this lawsuit a "dispute" is almost a misnomer, because Laufer has not ever disputed any of AKL's invoices.

[9] After AKL terminated its client relationship with Laufer but prior to filing this lawsuit, Katz learned of this fact from a third party with personal knowledge. *Id.*

notice that the plaintiff has brought the dispute to a court of law, does not willfully and flagrantly disregard the clear procedural deadline for answering the plaintiff's complaint and then seek to invoke the arbitration provision only after a default has been entered against him. That is what a sandbagger with no meritorious merits defense and a desire to delay does. When that fact pattern occurs, the court should hold that the defendant has waived his right to invoke the arbitration provision. *See Charming Shoppes v. Overland*, 186 Misc. 2d 293 (N.Y. Sup. Ct. 2000) ("The defendant affirmatively accepted the judicial forum, and waived any right to stay the action based on arbitration clauses in the agreements, by its failure to comply with answering the complaint [by the prescribed deadline and being in default].").

**B.  If the Court Grants Laufer's Motion to Dismiss/Compel, the Court Should Make Clear in Its Order That Laufer Is Judicially Estopped From Later Arguing That He Is Not Bound by the Terms of the AKL Engagement Letter.**

The Court should not grant Laufer's motion to dismiss/compel. The Court should enter a default judgment so that AKL does not need to waste any more of its lawyers' time seeking to collect payment from Laufer. The Court should also find that Laufer waived his right to invoke the arbitration provision. But if the Court is inclined to grant Laufer's motion to dismiss/compel, the Court should make clear in its order that Laufer has conceded and is judicially estopped from contesting that he is bound by all of the terms in the AKL engagement letter.

## IV.    CONCLUSION

For the reasons stated above, the Court should deny Laufer's motion to dismiss/compel. AKL also requests that the Court exercise its inherent authority to order Laufer to pay the imputed attorney's fees that AKL incurred to draft this opposition memorandum (*i.e.*, the hourly rate that Laufer agreed to pay for Katz's time under the AKL engagement letter, multiplied by the number of hours that it took Katz to draft this memorandum).

Respectfully submitted,


*/s/ Aaron M. Katz*
Aaron M. Katz
AARON KATZ LAW LLC
399 Boylston Street, 6th Floor
Boston, MA 02116
(617) 915-6305
akatz@aaronkatzlaw.com

*Counsel to Aaron Katz Law LLC*


DATED: November 13, 2023

## CERTIFICATE OF SERVICE

I, Aaron M. Katz, certify that a copy of the foregoing memorandum, including exhibits, was sent to Damien Powell, counsel of record to Issac Laufer, via the CM/ECF system on November 13, 2023.

_/s/ Aaron M. Katz_